Moses, Richard T., J.
This action was filed on January 30, 2004 by Merrimack Mutual Fire Insur *584 ance Company (“Merrimack”) against Virginia Slater (“Slater”). An amended complaint was filed by Merrimack on April 15, 2004. Merrimack seeks declaratory relief pursuant to G.L.c. 231A and, in particular, seeks a determination by the court that certain exclusions in a homeowner’s policy issued to Slater by Merrimack preclude any further recovery by Slater arising out of a loss occurring on or about July 19, 2003.
Slater has filed an answer and counterclaim asserting that Merrimack has only paid a portion of Slater’s insured loss and seeks recovery of the unpaid portion thereof.
The action was tried, jury waived, commencing February 5, 2007. Evidence was taken on February 23, 2007 and concluded on March 30, 2007 at which time the matter was taken under advisement.
FINDINGS OF FACT
On July 19, 2003, Slater was the owner of a single-family home situated at 556 Ware Street, Mansfield, Massachusetts (“the premises”). The premises were insured pursuant to a homeowner’s insurance policy issued by Merrimack for the period of March 19, 2003 to March 19, 2004. Slater resided at the premises with her then husband, Harold Blair (“Blair”).
On July 11, 2003, Blair was advised by his physician to discontinue an anti-viral medication that he had been taking for nine months. Shortly after discontinuing such medication, he began experiencing a number of symptoms, including dizziness. His symptoms abated somewhat and he resumed his activities as a truck driver which included out-of-state hauls.
Blair traveled to Connecticut on July 16, 2003 and returned home on July 17, 2003 at which time Slater noted that Blair was acting strangely. He was speaking in incomplete sentences which made no sense to Slater. Blair began engaging in other bizarre conduct. On the evening of July 18, 2003, Slater began preparing a meal for Blair. When she cut open a tomato he refused to eat it stating that it was full of bugs. At that point, Blair had not slept in several days and refused to go to bed. He began rifling through various boxes of papers in the house and then sat down and began ciying stating that there were “just so many bugs” and that he couldn’t enter his van because of the bugs. Slater called Blair’s psychiatrist who had treated him for depression. The psychiatrist attempted to convince Blair to go to a hospital but he refused. During the early morning hours of July 19, 2003, Slater finally retired into her bedroom. When she awoke at 5:00 a.m. she found the entire second-floor hallway of her home littered with clothes and papers. Blair was in the attic claiming that he couldn’t come downstairs.
Slater then went directly to the Mansfield police station. An ambulance and two cruisers were dispatched to the premises. Blair, upon observing the vehicles arriving with flashing lights, locked the front door and refused to come out and began yelling and screaming. The police also became aware that Blair was in possession of a rifle. An eleven-hour standoff ensued during which Blair barricaded himself inside the premises and broke various windows and did other damage to the interior of the structure. The parties have filed a stipulation which provides:
On July 19, 2003 by 12 noon the MetroStar Tactical Unit was in control of the situation at 555 Ware Street, Mansfield, MA. Deputy Chief Wells of the Newton Police Department was in charge of the scene.
After 12 noon the tactical unit neither heard nor observed any physical damage to the property-caused by Hal Blair.
After 4 p.m., Deputy Chief Wells ordered the tactical unit to make forced entry and deploy OC/CS gas in order to apprehend Blair.
The reason for entry was to apprehend Blair, for the safety of the tactical team, for Blair’s safety and the safety of the community.
The intent of the forced entry was not to damage Virginia Slater’s property, real or personal.
The evidence establishes that the tactical unit fired multiple canisters of OC/CS gas into the home which caused extensive damage to the home and its contents. Such damage includes, but is not limited to, gouges and holes in certain furniture as well as in sheetrock, on walls and ceilings. This damage was caused by the impact of the tear gas canisters fired into the home. Significant damage was also caused by the residue of the tear gas which permeated the entire home, including the attic. The tear gas left substantial amounts of a toxic residue throughout the entire house. Such residue made personal property which constituted “soft goods" worthless. Such items included cloth items such as couches, chairs, carpets and curtains. “Hard items” such as wooden tables, pots and pans and other like impermeable goods could be cleaned but only after taking stringent precautions in order to avoid exposure to the toxic residue. Also, complete clean-up of the structure required replacement of damaged sheetrock and insulation which had become contaminated by the residue.
Slater promptly notified Merrimack of her loss which arranged for Michael Wiseman, d/b/a Aftermath Cleaning Co. (“Aftermath”) to begin cleanup operations at the premises. Aftermath initially spent 126 man hours at the premises over the first four days following the incident during which broken glass and other debris was removed from the premises and it was made weather tight with plywood and plastic. Mr. Louis Certuse (“Certuse”), an independent adjuster, was assigned by Merrimack to investigate the loss. Certuse met with Slater and obtained a recorded statement from her relating to the circumstances regarding Blair’s conduct and the resulting damage to her home. Certuse also attempted to obtain a copy of *585 the police reports, however they were not released due to the pendency of criminal proceedings against Blair. Certuse and Merrimack immediately recognized that there may be coverage issues in connection with the subject loss. By letter dated July 24, 2003, Merrimack notified Slater that its investigation was ongoing relating to coverage issues.
By letter dated July 31, 2003, Certuse notified Slater that there was no coverage under her policy due to an exclusion relating to “acts or decisions including the failure to act or decide of any person, group, organization or governmental body.” Certuse further advised Slater that he had determined from the Mansfield Police Department that the window breakage was caused by Blair and not the police and that this was an unintentional act caused by his reaction to medication and hence Merrimack agreed to coverage for the repair all broken windows. The letter further denied coverage relating to the contents of the premises.
On August 4, 2003, Robert A. Rougier (“Rougier”) of Merrimack wrote to Slater stating Merrimack’s final conclusions relating to coverage issues. In such letter, Rougier indicated that while there was an exclusion in the policy as to an intentional loss arising out of an act committed by an insured (which included Blair as a household member), Merrimack concluded that Blair did not have the requisite intent in light of his psychiatric or medical condition and hence the exclusion was inapplicable. Slater was thus notified that Merrimack would only pay for those damages which were inflicted upon the premises by Blair.
With respect to the remaining damages caused by police conduct, Merrimack denied coverage based upon the above referenced exclusion relating to “acts or decisions including the failure to act or decide of any person, group, organization or governmental body.” Slater was also referred to an exclusion with respect to the contents coverage of the policy relating to damage caused by the destruction, confiscation or seizure by order of any government or public authority or acts or decisions, including the failure to act or decide of any person, group, organization or governmental body.
The court finds that the coverage decision made by Rougier was after receipt and consideration of an opinion letter of counsel dated July 30, 2003.
Slater proceeded to engage Jim Harlor (“Harlor”), a public adjuster employed by Swerling Milton Winnick Public Insurance Adjusters, Inc. (“Swerling”), to assist her in her dealings with Merrimack. Harlor advised Merrimack of his desire to adjust the entire loss including that which was alleged to be covered and that which was alleged to be non-covered. With respect to damage to the premises caused by Blair, Harlor pointed out that the initial estimate by Merrimack did not include the necessary repair of siding and exterior painting incidental to the replacement of doors and windows.
In advocating for Slater, Swerling provided Certuse with a coverage opinion of the Fire, Casualty and Surety bulletin (“FC&S”), which is an authoritative resource in the insurance industry relating to various coverage issues. The FC&S bulletins are subscribed to by most insurers, including Merrimack. The subject bulletin provided to Certuse was in the May 1992 issue and was numbered “Q&A 871.” The question posed was from a California subscriber relating to a commercial property. In such instance, a fugitive attempted to escape the police and went into the insured’s premises to take hostages and was forced to surrender with the use of tear gas and gunfire. In the process of capturing the fugitive, damage was done to the building and personal property of the insured. The insurer relied upon an exclusion for loss of damage caused directly or indirectly by seizure or destruction of properly by order of governmental authority. The FC&S bulletin responded:
The exclusion of loss caused by order of governmental authority is not so broad to exclude this type of loss. The aim is to exclude coverage for the intentional destruction of property by governmental authority because of some hazard that the property presents, such as when the government orders the destruction of vegetables that are infected with a Mediterranean fruit fly.
In the case you present, the destruction done by the police was incidental to the capture of the fugitive. Bullets that damaged equipment were intended to control the fugitive — they were not fired because the equipment posed any danger to the people or property. One would not expect that the police officer in charge to state that he or she ordered the destruction of property. For these reasons, the insured has coverage under the policy.
Such bulletin was provided by Swerling to Certuse by letter dated November 14, 2003.
The court finds that the damage caused by Blair was not intentional within the meaning of the subject policy and hence is covered under the terms thereof. The court further finds that Blair’s conduct set in motion a chain of events causing additional losses to the insured’s premises and its contents, including the damage caused incidental to the entry of the premises and the apprehension of Blair. The court further finds that while the FC&S bulletin referred to above is not binding, it is certainly instructive and helpful in interpreting the exclusion relied on by Merrimack in denying coverage.
SLATER’S COVERED DAMAGE UNDER THE POLICY DAMAGES TO DWELLING (COVERAGE A)
The parties stipulated that the physical damage to the dwelling incurred as a result of the combined acts of Blair and the police totals $45,037.83. Merrimack paid the sum of $20,420.68 on account of damages to *586 the dwelling directly inflicted by Blair. The court finds that Merrimack is indebted to Slater in the amount of $24,617.15 for the remaining physical damage to the dwelling. Such sum represents a fair and reasonable charge for the repair of the subject dwelling.
DEBRIS REMOVAL AND CLEAN-UP COSTS RELATING TO DWELLING
Merrimack is responsible to Slater for any reasonable expense of debris removal, which expense is included in the limit of liability that applies to the damaged property. (See “Additional Coverages, No. 1 Debris Removal” at page 4 of 18 of the subject policy.) Such coverage is included in the limit of liability that applies to the damaged property. Aftermath issued a bill for services for temporarily securing the premises and removing debris. Such bill was in the total amount of $10,710.00, which charge the court finds to be fair and reasonable.
Aftermath submitted an estimate for a total cleanup of the premises which included removal of all toxic residue from the dwelling as well as cleaning of such personal property as could be cleaned and the disposal of the remaining soft goods which could not be cleaned. Such estimate was in the range of between $60,000.00 and $80,000.00. Certuse pressed Aftermath for a quote relating solely to the structure which resulted in an estimate of $28,500.00. In light of Merrimack’s coverage position, it limited its payment on account of the aforesaid claim to $5,365.50. The court finds that Slater did not have the financial means for Aftermath to complete the cleaning and undertook the arduous process of cleaning the dwelling and certain contents over the course of approximately seveniy-five weeks, during which Slater and her friends expended hundreds of hours. During such cleanup, Slater also incurred the sum of $1,1055.00 for food for her helpers as well as $600.00 for a dumpster and $600.00 out-of-pocket for cleaning expenses.
Having considered the testimony of Michael Wise-man, of Aftermath, as to the extent of work required for the cleanup of the subject dwelling as well as his testimony as to the estimated cost of said cleanup and further considering the testimony of Slater with respect to the efforts expended by her relating to the work involved in such clean-up, the court finds that a fair and reasonable charge for such clean up would be $38,000.00. Merrimack has paid the sum of $5,365.50, leaving a balance due and owing to Slater in the total amount of $32,634.50.
DAMAGES TO PERSONAL
PROPERTY (COVERAGE C)
Swerling prepared a schedule of damage to personal property for Slater and submitted the same to Merrimack which sum totaled $302,722.65, excluding debris removal. The parties stipulated that the damage to Slater’s personal property exceeded the policy limits of $154,700.00. The court thus concludes that Slater is entitled to be compensated to the policy limit of $154,700.00 for damage to personal property.
SLATER’S CLAIM FOR LOSS OF USE (COVERAGE D)
The court finds that Slater was unable to occupy her home for a period of seventy-eight (78) weeks following the July 19, 2003 incident. For the first twelve weeks of Slater’s absence from the home, Merrimack paid her the sum of $475.00 per week for a total of $5,700.00. The court finds that Slater was unable to occupy the premises for the aforementioned seventy-eight-week period due to the contamination thereof which arose out of the incident of July 19, 2003. From July 19, 2003 until January 17, 2004, Slater lived with friends and lacked complete use of the premises. From January 17, 2004 through January of 2005, she resided in a small, unfinished area in the basement sleeping on a cot. The court finds that the amount of time taken to complete clean-up of the premises was reasonable in light of Slater’s limited financial means and the refusal of Merrimack to honor her claim. Merrimack argues that the policy in question requires that there be evidence that the actual living expense be incurred. The court finds this argument unpersuasive in light of the fact that Coverage D of the policy provides in part:
... we cover at your choice either of the following ... a. additional living expense, meaning any necessary increase in living expense incurred by you so that your household can maintain its normal standard of living or b. fair rental value meaning the fair rental value of that part of the residence premises where you reside less any expenses that did not continue while the premises is not fit to live in.
It is apparent to the court that Merrimack acknowledged that the fair rental value of the premises was $475.00 per week and paid such sum for the first twelve weeks. Merrimack is liable for the remaining sixty-six (66) weeks that the premises was uninhabitable, for a total of $31,350.00.
The court finds that the remaining claims for damages made by Slater were not sufficiently substantiated and are therefore not awarded.
RULINGS OF LAW
Merrimack relies exclusively upon the following provisions of the policy in its attempt to exclude Slater’s claim. Under Section I, paragraph 2, the policy provides:
[w]e do not insure for loss to property destroyed in Coverages A and B caused by any of the following. However, any ensuing loss to property described in Coverages A and B not excluded or accepted in this policy is covered.
b. Acts and decisions including the failure to act or decide of any person, group, organization or governmental body.
*587 Merrimack further relies on the provisions of Section I — Perils insured against of the policy provides:
[w]e do not insure, however, for loss:
3. Under Coverage C caused by:
e. destruction, confiscation, or seizure by order of any government or public authority; or
f. acts or decisions including the failure to act or decide of any person, group, organization or governmental body . . .
Exclusions from insurance coverage are to be strictly construed with any ambiguities in insurance policies to be resolved against the insurer. Jussim v. Mass. Bay Ins. Co., 33 Mass.App.Ct. 235, 239 (1992), citing Quincy Mut. Fire Ins. Co. v. Abernathy, 393 Mass. 81, 83 (1984). In Jussim, the Appeals Court commented upon an exclusionary provision in the subject homeowner’s insurance policy which related to “acts or decisions including the failure to act or decide of any person, group, organization or governmental body.” The Appeals Court noted that such clause cannot be taken literally and if so taken it would exclude coverage from all acts and decisions of any character of all persons, groups or entities and leave the insurance policy practically worthless. Jussim, 33 Mass.App.Ct. at 238-39. The Merrimack policy contains the identical overbroad language which would, on its face, appear to exclude coverage from any and all acts and decisions of any character of all persons, groups or entities. The court finds that it would be unconscionable to allow Merrimack to rely upon this overbroad exclusionary provision.
The court further finds that the reliance by Merrimack on the exclusion under Coverage C as to a loss caused by destruction, confiscation or seizure by order of any government or any public authority is misplaced. As previously indicated, this court finds the FC&S bulletin hereinabove referred to as being persuasive although non-binding. The court finds that any order by the police to fire tear gas into the subject premises was not for destruction, confiscation or seizure but rather an attempt to remove Blair from the premises. Any ambiguity in the language of such clause must be construed in favor of Slater as the insured. Furthermore, even if the acts of the police fell within such clause and were an excluded event, Slater’s claim would still be covered in light of the fact that it originated from a covered event or occurrence, namely the conduct of Blair. See Hanover New England Ins. Co. v. Smith, 35 Mass.App.Ct. 417 (1993). Our courts have noted that there is a difference between an excluded event which causes a loss and a covered event which causes a loss in the form of an excluded event in which case a chain of events test applies and the insurer is held liable for the loss produced by an excluded cause if it was, in turn, produced by a covered clause. Id. at 421, citing Petigole v. American Employer’s Ins. Co., 30 Mass.App.Ct. 272, 276 (1991). See also Jussim v. Mass. Bay Ins. Co., 415 Mass. 24, 27-30 (1993).
The court finds that the conduct of Blair was in fact the active efficient proximate cause of the total loss sustained by Slater. Such active efficient cause set in motion a chain of events which brought about the intervention by the authorities and the resulting loss. Jussim, 415 Mass. at 27.
As the Supreme Judicial Court pointed out in Jussim, the insurer could have excluded Jussim’s claim for oil pollution merely by using language which was in the preamble section but not under the applicable section which language provided:
[w]e do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence up to the loss.
There is no such language contained in the Merrimack policy in either its preamble or in any of the applicable coverages. Thus, even if the conduct of the police in the case at bar constituted an excluded act, Merrimack would have been required to have appropriate concurrent cause language similar to that cited above in order to exclude damages arising out of the same.
While the court finds that Slater is entitled to recover in this action, it does not find that Merrimack’s conduct rose to the level of bad faith. It was acknowledged that Merrimack had only invoked the governmental act exclusion on one prior occasion which involved a search warrant. Furthermore, Merrimack sought and obtained an opinion of counsel which was relied upon in denying coverage.
ORDER
For the foregoing reasons, it is ORDERED that judgment enter as follows:
1. On the amended complaint of Merrimack Mutual Fire Insurance Company seeking declaratory relief, the court finds and therefore ORDERS that judgment enter that the defendant, Virginia Slater is entitled to recovery under the subject policy for damages arising out of the conduct of Harold Blair on July 19, 2003, including damages caused by any law enforcement personnel during the course of apprehending Blair. The court awards damages to Slater pursuant to Slater’s counterclaim.
2. The court further ORDERS that judgment enter in favor of Slater on her counterclaim in the amount of $243,301.65, together with statutory interest and costs.